MILLER v. CRAMER.

MILLER v. ANDREWS.

1. DEED.—In a deed, if there is a conflict between the provisions, those first declared prevail.
2. LIMITATION OF ESTATES.—*Held*, that the lots in question were held by executor of C. with a resulting trust in favor of M., and that the private creditors of C. had no claim on the property.
3. TRUST—PRESUMPTION—TRUSTEE—CESTUI QUE TRUST.—Where it is the plain duty of a trustee to convey a lot, and he does not, but acknowledges the right of the *cestui que trust* to the possession for twenty years, it will be presumed that it was conveyed.
4. TACKING—ADVERSE POSSESSION.—For purpose of showing continuous adverse possession, the *cestui que trust* may tack to the trustee and the heir to the ancestor.
5. ADVERSE POSSESSION—COTENANTS.—What constitutes adverse possession by one cotenant as against the others considered.

6. TITLE—PURCHASER.—A purchaser is not compelled to take a *doubtful* title, but he will not be permitted to object to a title on account of *mere possibility*.

Before BENET, J., Charleston, July, 1896. Affirmed.

Action by William Starr Miller, George Norton Miller, and Horatio Ray Miller against Horatio C. Hughes, and the same against A. F. C. Cramer, to compel specific performance of their bid for certain real estate. Three cases of like import were tried together on Circuit. This Court adopts the Circuit decree, which is as follows, excepting the formal parts:

These three cases, involving to a large extent the same facts and the same principles of law, were conducted and argued together before the master, and were also argued together before me, upon exception to the master's report. Three pieces of property in Charleston are involved—a vacant lot on Bee street and two adjoining lots with buildings on them on Spring street. One C. V. Chamberlain bought these lots in 1863, and the title anterior to him was not seriously contested. He bought these lots and a good many other lots, a farm on Charleston Neck, and a large lot of cotton, prior to the 10th of February, 1865. On that day he executed a "declaration of uses" in regard to all this property. In it he recites that George N. Miller, of New York, had for many years been a partner with himself, C. V. Chamberlain, under various styles and firms. That George N. Miller had some years previously withdrawn from the firms and retired from business. That he had left Chamberlain in possession of the partnership funds, to manage, collect and settle the same. That large sums of money had during the present war and before been thus collected by Chamberlain, "for and to the use of the said George N. Miller, which it was not possible to remit to Miller in New York (evidently because the war between the States was then flagrant), nor to hold and safely keep *for his use*, by reason of the war and of the great doubts and uncertainty

of the nature of the present currency." That it was unsafe
to invest "said trust money in the name of the said Miller,
to whom it rightly belonged" (evidently from fear of con-
fiscation by the Confederate government). That, therefore,
he, Chamberlain, had made "large investments, and the
same appear to be his own estate and property, but are in
fact in trust for George N. Miller," who might be "put to
great trouble and vexation" should he, Chamberlain, die
without executing this declaration. Chamberlain, in this
"declaration of uses," sets out the property bought as above,
viz: fourteen different pieces of real estate, and 190 bales of
upland cotton and 200 bags of sea island cotton. The lots
involved in these suits are mentioned in this "declaration
of uses." This "declaration of uses" was naturally not put
on record till after the war. It was left in the possession
of J. B. Campbell, then a prominent member of the Charles-
ton bar, who represented Miller, and after the war was taken
by Chamberlain, with the full assent of all his late copart-
ners, to New York and then delivered to Miller. It was
put on record in Charleston County, S. C., on the 17th
March, 1868; Colleton County, S. C., on the 14th August,
1877; Leon County, Florida, 27th July, 1891. With the
above "declaration of uses," which neither Chamberlain nor
any one claiming through him can contradict or deny, there
was clearly a resulting trust as to all this property in favor
of George N. Miller. The declaration is emphasized by
the record of the deed not only in 1868, but also in 1877,
and as late as 1891. Chamberlain concludes this "declara-
tion of uses" by saying, that he holds the said property
(both real and personal) "for the use of the said George N.
Miller * * * for and until the full payment as aforesaid
(of all moneys due Miller 'by reason of the above recited
premises'), in case they shall be sufficient for such payment,
and the surplus, if any, for his, Chamberlain's, own use."

This subsequent declaration cannot vary the effect
of the declaration contained in the first part of the
deed. In a deed, if there is a conflict between the

provisions, those first declared prevail. *Sims* v. *Meachan*, 2 Bail., 101; 4 Cruise Dig. Real Estate, 244, s. p. specially n. 2. Chamberlain could not buy property with Miller's money and then say that if any profit resulted from the investment, he, Chamberlain, trustee, and not Miller, whose money had bought the property, should have it. *Minton* v. *Pickens*, 24 S. C., 592; 27 Am. & Eng. Enc. of Law, p. 194. The defendants claim, however, that subsequent events change the above, viz: Chamberlain died in 1866, leaving of force his last will and testament, which was probated 16th February, 1867, headed, "State of South Carolina, Charleston District," by which he gives all his property, real and personal, to "Letitia Chamberlain, of Kings County, New York," on the trusts to convert all his property into cash, and to hold it up to the amount of $100,000, for the use of herself and *her* children (naming them), and the surplus, if any, to his brother, Alfred Chamberlain, for his, Alfred's, daughters. He appoints Alexander Isaacs and Thomas R. Waring his executors. On 4th April, 1868, Letitia Chamberlain filed her bill in equity in Charleston County, S. C., against Alex. Isaacs and Thomas R. Waring, executors, George N. Miller, Alfred L. Chamberlain, trustee, Ann V. Chamberlain, George L. Chamberlain, and Charles Chamberlain (these last three being Letitia's children). She claimed to be the wife of C. V. Chamberlain. Answers were filed by all the defendants. The children were then (13th May, 1868,) of the respective ages of fifteen, thirteen, and nine years. The youngest, therefore, came of age in 1880. B. C. Pressley (subsequently Judge Pressley) was appointed their guardian *ad litem*. No testimony is on file, and all we know of the facts of the case is derived from the pleadings and from Master Gray's elaborate report of 15th July, 1869. It appears that some testimony as to Letitia's marriage, which was denied by Miller and Isaacs and Waring, was taken, and then the case was stopped and compromised. Mr. Gray reports that C. V. Chamberlain had in his lifetime been a member of sev-

eral firms, the more recent of which were Chamberlain, Miller & Co., consisting of Chamberlain (deceased), Miller (alive), and Smalls (deceased); and Chamberlain, Isaacs & Co., consisting of Chamberlain (deceased), Smalls (deceased), and Isaacs (alive). He then reports that the undivided halves of the lots on Spring street were partnership property, and the other undivided halves and the lot on Bee street were the private property of Chamberlain, thus contradicting Chamberlain's declaration without an iota of testimony. Then he sets out the "declaration of uses" mentioned as above, and reports that it was made with the full assent of all Chamberlain's partners. That subsequently Miller released to his former partners the interest on the debt due to him which had accrued during the war, and, furthermore, allowed them to sell the cotton "dedicated to his relief," and "which he had an undoubted right to hold," and to pay *all* their other debts, so that he was the sole creditor of the two firms. That they owed him then (15th July, 1869,) $154,008.87, with interest since 23d November, 1865, which there was no hopes that the partnership property would pay. That the private property of Charles V. Chamberlain is chargeable first with his private debts, including the chief one to Miller of $4,100 and interest, and was *sufficieut* to pay all these and leave a surplus. But even with this surplus added, the partnership debt to George N. Miller, for which Chamberlain's private property was liable, could not be paid. The settlement recommended by Mr. Gray was that Letitia Chamberlain should release all claims, including her claim for dower on the estate of Chamberlain, surrender certain stocks of his she held (South Carolina Railroad, 100 shares), and convey all partnership property to Isaacs and Miller, survivors, and all Chamberlain's individual property to Isaacs and Waring, executors, and in return she was to receive $3,000 in cash, and George N. Miller was to return to her the securities he held as collateral to the debt of $4,100, release her from it, and look to the estate of Chamberlain for its

payment. This settlement was confirmed by a consent decree of 16th July, 1869. By it the executors were authorized to sell Chamberlain's private property, to be administered according to law. On the 22d July, 1869, eight days later, all the solicitors in the case signed a memorandum stating that an error had been made in the decree, and that the same was "intended by all the parties thereto and their solicitors, *not to modify or impair the value* to the defendant, George N. Miller, of the declaration of uses in his favor made by C. V. Chamberlain February 10th, 1865, of his *private real estate*, except so far as may be necessary to apply it for the payment of his private debts, after which the property named in the declaration is to be applied according thereto to the payment of the debt to Miller." By a decretal order of 14th June, 1870, modifying the erroneous order, it is decreed, "That the *real estate* of the testator, C. V. Chamberlain, by his deed of February 10th, 1865, *dedicated* to the payment of the debt of Chamberlain, Miller & Co., to George N. Miller, be *applied* and *paid* on said debt * * * and also that the said executors, after payment of his personal debts, do in like manner pay whatever may remain of his estate, real and personal, on the said debt to George N. Miller; all such payments to be credited to the account of C. V. Chamberlain in the partnership books for future accounting." Letitia Chamberlain released all the property respectively to the proper parties, according to the decree, was paid off, and with her children and Alfred L. Chamberlain and their solicitors (Hayne & Son) disappear from the case at this point, Messrs. Campbell & Pressley remained. Miller being dead, Isaacs, in consideration of $50,000 *credited* on Miller's debt, but not *paid* to him by Miller, conveyed all the property designated as partnership property to Miller by deed, dated 30th June, 1877. This was confirmed by the Court. Mr. Pressley assents to this order, and appears in the case no longer as attorney. Under this deed pass the undivided halves of the two lots on Spring street, and there is no dispute as to the title of

these halves.   Nothing more was done in the case till 22d April, 1880, when Campbell for Miller availed himself of the leave given by the decree of 14th June, 1870, to any party to apply at the foot of that decree for further orders, and filed a petition in the case setting out all previously stated facts, adding that Waring, executor, had died, and that Isaacs, as surviving executor, could not sell the property without the order of the Court.   This petition was served on no one.   It came before Judge Pressley, then on the bench, and acquainted, as former counsel, with all the facts.   On 22d April, 1880, he filed his decree, holding (1) That by the deed of Chamberlain, 10th February, 1865, it was declared that these lots (including all the lots in dispute) were "purchased and paid for with the moneys of the said petitioner (Miller), and that the testator, Chamberlain, had only a legal estate therein, *while the use* and equitable estate was in the petitioner (Miller)." (2) That Letitia Chamberlain, by order of the Court, had conveyed the said lands to Waring and Isaacs, executors, "to the intent that they should *convey* them unto the petitioner (Miller), or apply them to the payment of the debt to him."   Therefore, he decreed that Isaacs, executor, "*have leave* to sell and dispose of the five lots of land * * * and that he apply the proceeds of sale," as directed previously.

This ended the proceedings in the main cause, and leaves no doubt in my mind that the five lots of land set out in this petition were held by Isaacs, the executor of Chamberlain, in the same right that Chamberlain held them since February 10th, 1865, viz: with a resulting trust in favor of George N. Miller.   The decretal order of 14th June, 1870, modifying and correcting the decretal order of 16th July, 1869, makes this clear.   From the date of that decree, no private creditors of C. V. Chamberlain had any claim on this property.   In his lifetime, as far back as 1865, thirty-one years ago, he had dedicated these lots to the payment of the debt, whether his own debt or that of the firm, due to George N. Miller, by declaring that he held them

to his use.    Private. creditors, if there were any such, could not interfere with this.    They were relegated by the decree of 22d April, 1880, to the remainder of his property, which was sufficient to pay his debts.    Further we have a list of Chamberlain's private creditors.    They are only George N. Miller himself, Letitia Chamberlain, claiming to be his wife, who could not, if his wife, have had a claim against him in 1866, and one Eliza Lewis.    Miller's debt we need not consider.    Letitia's claim is a sealed note, dated May, 1866, and was presumed paid in 1886.    In any case, she was a party to the suit, and paid off.    Eliza Lewis' claim is a sealed note for $957.51, dated 15th July, 1856. It was presumed paid as far back as July, 1876.    From 1865, then, Chamberlain and Isaacs have held these five pieces of property as dry trustees, with the sole duty to convey them to George N. Miller.    *Williams* v.
3    *Hollingsworth*, 1 Strob. Eq., 111.    Perry Trusts, sec. 165a.    Under the recent decisions in this State, it may well be held that this resulting trust in favor of George N. Miller, was executed as early as 1863; and certainly after the decree of the 22d April, 1880, and that the title was then vested in him.    As in *Railway Co.* v. *Scott*, 38 S. C., 38, it was "a dry trust," and nothing was to be done by the trustee except to turn the title over to George N. Miller.    *Foster* v. *Glover*, 46 S. C., 526.    But be that as it may, the law presumes that Isaacs, on 22d April, 1880, did his duty as he had done it previously, in regard to the so-called partnership property, and conveyed these five lots, etc., to Geo. N. Miller.    The debt to Miller on 22d April, 1880, disregarding cents, was: Original debt reported by Gray, $154,009; interest from 23d November, 1865, to June 20, 1877, $114,870—$268,879.    Deduct value of partnership property conveyed to him by Isaacs, $50,000— $218,879.    Add interest to 27th April, 1880, $43,000; due Miller on 22d April, 1880, $261,879.    Gray's report shows that there was no possibility of the property paying this debt.    The valuation given of these five lots in 1894 was

$20,000 to $25,000; deficit, $236,879.  So the sale which Isaacs had "leave" to make, but was not ordered to make, of property which by order of Court Letitia Chamberlain had conveyed to him and Waring, "to the intent they should convey them unto the petitioner," or apply them to the payment of his debt, was simply to incur useless expense and inflict a greater loss on Miller.  It was clearly Isaacs' duty to make the conveyance.  His own declarations make it clear that Miller had possession of the property, and was receiving all the income from it, and that he held all this property as Miller's, and in no other right. The rule of law in such cases is, that "there is hardly a species of act or document, public or private, that will not be presumed in support of possession."  Best Presumptions, sec. 393.  "§ 394. Under this head comes the important doctrine of the presumption of conveyances by trustees.  It is a general rule that, whenever trustees ought to convey to the beneficial owner, it should be left to the jury to presume that they have so conveyed, where such presumption can reasonably be made.  This rule has been established to prevent just titles from being defeated by mere matter of form, but it is not easy to determine the extent of it.  It may, however, be stated generally that the presumption ought to be one in favor of the owner of the inheritance, and not one against his interests.  So, also, analogously as to the surrender of terms."  "§ 397. Where acts are done or omitted by the owner of the inheritance and persons dealing with him as to the land which ought not reasonably to be done or omitted if the terms existed in the hands of a trustee, and there does not appear to be anything that should prevent a surrender from having been made, a surrender of the term may be presumed." * * *  "§ 399. Whether, where presumptions are made in support of a peaceable or beneficial enjoyment, the jury are bound to believe in the fact which they find, has been made a question, and there certainly are authorities both ways.  Upon the whole, it may, perhaps, be safely laid down that, as in

all presumptions of this nature, legal considerations more
or less predominate, the jury ought to find as directed or
advised by the Judge, unless the suggested fact appears ab-
surd or grossly improbable." * * * This doctrine is fully
supported by Mr. Greenleaf, vol. 1, sec. 46, and Sugden V.
& P., cited by both of the above authors. This case comes
completely under the above rule. Miller and his heirs
have conclusively proved their "right to the beneficial en-
joyments" of the property, and have been in possession, re-
ceiving the rent exclusively for more than twenty years.
Acts have been done by them, and persons have dealt with
them as to this land, which ought not reasonably to have
been done if they were not the owners of the land. They
have sold parts of the property and purchasers have accepted
the title. Isaacs, as executor, had the one duty to perform,
to convey this property to Miller. There is nothing "ab-
surd or grossly improbable" in presuming that he did make
the conveyance to Miller. Therefore, he was not only prac-
tically but also actually right in his invariable and often
repeated and uncontradicted declarations made for more
than twenty years that the property was Miller's. Equity
will in this case enforce its favorite doctine, and consider
that done which should have been done.

There is another ground upon which I feel bound to sup-
port the title of the Millers, and that is the ground of *time*,
both on the presumptions that arise from the lapse of twenty
years and from adverse possession. For the presumption
arising from the lapse of time, twenty years, the Millers
have the right to tack their possession to that of Chamber-
lain's and thus go back to 1863, more than thirty
years. Or really, as the title back of Chamberlain's
was admitted to be good, it goes back really to the
grant. *McLeod* v. *Rogers*, 2 Rich., 22 and 23. This pre-
sumes a title: "The lapse of twenty years (Ch. Harper) is
sufficient to raise the presumption of a grant from the State;
of the satisfaction of a bond, mortgage or judgment; of the
grant of a franchise, or the payment of a legacy, or almost

292    MILLER *v.* CRAMER.

anything that is necessary to quiet the title of property. * * * It is hardly necessary to say that legal presumptions are not founded on actual belief. * * * *Wilcox* v. *Waller*, 12 Ves., 267; *Mayor* v. *Holmes*, Cow., 162; *Bedle* v. *Baird*, 12 Co., 5, p. 280. Presumptions must be sometimes against the well-known truth of the fact." "If twenty years have elapsed without the payment of interest, * * * we would presume it (the bond) paid, notwithstanding the fullest conviction that it never has been paid." (387.) *Riddlehoover* v. *Kinard*, 1 Hill Ch., 376; *Cf. Hutchinson* v. *Nolan*, 1 Hill, 222. "The belief may be distinctly the other way, and yet the presumption exists." (*Ib.*, 380.) As the facts stand in this case, the presumption in favor of Miller and his heirs may be started from several periods, each giving him therein more than twenty years' possession. 1st. From 1863, when Chamberlain bought the property with Miller's money. This gives thirty-two years' possession of Miller and those through whom he claims, no matter what may be the effect of Chamberlain's "declaration of uses," or of the proceedings in Letitia Chamberlain *v.* Isaacs, etc. 2d. The deed of Letitia Chamberlain to Isaacs and Waring, executors (1869), they holding as the executors of C. V. Chamberlain, and holding only to the use of George N. Miller, more than twenty years, and under the final decree in the case to convey the property to Miller, or to sell it and apply the proceeds, confessedly inadequate to the debt due to Miller. The lapse of twenty years is proved by Kennedy's testimony as to the Spring street lots, that he and his father collected the rents from them for over twenty years for Isaacs as the agent of George N. Miller, and after his death, for his heirs, and continues in the same way to do so now for Hastie as agent, since Isaacs' death, for the Millers. As to the vacant lot on Bee street, as early as 1874 Major Gadsden leased it from Isaacs as the agent of George N. Miller, and held it as tenant in this way for fourteen consecutive years. Since that time it has been steadily in the possession of Miller's agent, though some time unoccupied.

Miller's agents have paid taxes on the land and received what rents have come from it, have kept it fenced and held it as Miller's property without challenge since 1874, twenty-two years.   This constitutes exclusive possession; and I find as a matter of fact that George N. Miller and his heirs (the present plaintiffs) have had exclusive, continuous, and adverse possession for over twenty years.   Again, the title of the Millers, the present plaintiffs, is good by adverse possession.   They are the heirs of their father, and, therefore, can tack his possession to theirs.   Whatever doubt on the point ever existed, it is now settled law in this State that adverse possession is not only a "shield of defense, but also a sword of offense."   *Busby* v. *Florida Rd. Co.*, 45 S. C., 312.

"The law presumes possession unexplained to be adverse possession."   *Alexander* v. *Gibbon*, 24 So. East. (N. C.), (April, 1896,) p. 750.   "Holding exclusively and adversely and openly are the highest acts in the power of the disseizor to indicate his intention."   *Kinsell* v. *Daggett*, 11 Maine, 309–314; cited in *Elder* v. *McClaskey*, 70 Fed. Rep., 540.   Even a cotenant is not bound to give actual notice to his cotenant of "ouster or disseizure." "He must, in the language of the authorities, 'bring it home' to his cotenant.   But he may do this by conduct, the implication of which cannot escape the notice of the world about him, or of any one, though not a resident in the neighborhood, who has an interest in the property, and exercises that degree of attention in respect to what is his that the law presumes in every owner."   Said Mr. Justice Bradley, *In re Broderick's Will*, 21 Wall., 503, 519: "Parties cannot, by their seclusion from the means of information, claim exemption from the laws that control human affairs, and set up a right to open up all transactions of the past.   The world must move on, and those who claim an interest in persons and things must be charged with the knowledge of their status and condition, and of the vicissitudes to which they are subject."   See, also, *Townsend* v.

*Eichelberger* (Ohio Sup.), 38 N. E., 207; *Webster* v. *Society*, 50 Ohio St., 1, 13, 33 N. E., 297; *State* v. *Standard Oil Co.*, 49 Ohio St., 137, 188, 30 N. E., 279; *Williams* v. *Coal Co.*, 37 Ohio St., 583; *Howk* v. *Minnock*, 19 Ohio St., 462. * * * "By the overwhelming weight of authority, however, actual notice is not necessary, and acts public and notorious, and of such a character as to leave no doubt to any one observing that exclusive right of enjoyment against every one is asserted by the holder, are quite sufficient to bring home notice of ouster to the tenants in common." *Elder* v. *McClaskey*, 70 Fed. Rep., 540. The claim of the defendants that the Millers were equitable tenants in common with Chamberlain's private creditors, and, therefore, could not acquire title by adverse possession, I cannot sustain. If any creditors other than Eliza Lewis ever existed, their claims, like hers, are presumed to have been long since paid. Chamberlain's will was proved February, 1867. (He died in 1866.) He left an estate large enough to pay his private creditors (of whom George N. Miller was the largest), and leaves a surplus. It is impossible to suppose that in these circumstances that Isaacs and Waring, both unimpeached in character, did not discharge their duty and pay these debts, or that the creditors, if unpaid, would not have sought a remedy at law. *McKinley* v. *Gaddy*, 26 S. C., 573, is conclusive on this point.

Of one thing there is no dispute. When Isaacs died in December, 1882, and Hastie & Son took possession of all this property, they took possession of it solely as the agents of George N. Miller, and have ever since held as such or as agents of himself or of his heirs, without challenge from any one. They cannot be charged with any character of executor or trustee, &c., and have held it openly, notoriously, exclusively, continuously, and adversely to all the world since 30th December, 1882, simply and solely as agents of the Millers. The title deeds in this case were tendered to Cramer and Drews, the other purchasers, in September, 1894, more than ten years after Hastie & Son took posses-

sion solely and exclusively as the agent of the Millers, and there are no minors interested. It would be enough, however, if possession had ripened into title before this decree. *Lesesne* v. *Witte*, 5 S. C., 463. Nothing has been produced by the defense to rebut the presumption of law that the possession of the Millers was adverse; on the contrary, the clear preponderance of the evidence is that it was adverse.

Again, the law does not compel any one "to take a doubtful title. But on this subject the Court acts on a moral certainty, and a purchaser will not be permitted to object to a title on account of a bare possibility."

In this case, not even a "bare possibility" of the title being bad, or being attacked, has been shown.

I do not consider at length the *ex parte* proceedings of the plaintiffs in this cause, in the case of Letitia Chamberlain *v.* Isaacs *et al.*, because I have reached the conclusion, independently of this, that the Millers have a good and marketable title which the purchasers must take.

Both by general law and also by the special provision of the decree in these *ex parte* proceedings, the Millers have the right to disregard these proceedings and rely on any title they have. *Strange* v. *Durham*, 1 Bay, 441; *Gordon* v. *Parsons*, 1 Bay, 38 (A. D. 1786); *Giles* v. *Pratt*, 2 Hill, s. p. 439; *Riddlehoover* v. *Kinard*, 1 Hill Ch., 376; *Whitman* v. *Bowman*, 27 S. C., 53; *Bligh* v. *Rochester*, 7 Wheat., 545; Bigelow Estoppel, pp. 355–360. I do not, however, see that the proceedings are irregular. Their sole object was to have a purely ministerial order executed. The Court had ordered Isaacs either to convey the property to Miller or to sell it and apply the proceeds to the payment of the debt due to him. Isaacs had died, and Miller had died, and no deed from Isaacs to Miller could be found by Miller's heirs. Under the leave reserved, they, as privies both in blood and estate to George N. Miller, applied to the Court for an order to the master to execute the conveyance. The Court looked into the matter, and found property valued at $25,000 to meet a debt of $261,879, with

interest from, say, April, 1880, to October, 1893, $238,420—$500,299—and no assets to do more. It ordered the sale. *Morgan* v. *Morgan*, 45 S. C., 323, establishes the right of the Miller heirs to file these proceedings. The only question is, should they have served notice on the parties to the original suit? In *Morgan* v. *Morgan* there is an *obiter dictum* that implies that they should have done this. But on this point these cases are wholly different. In *Morgan* v. *Morgan*, creditors sought to subject property of the decedent *in the* possession of his heirs to the debts of the decedent. In other words, sought active relief against the heirs, and sought to change the rights of parties. In Miller's case no relief against any one was sought and no change of right asked.

In courts of law, only parties having an interest in the subject of litigation are brought into court. In this case no party to the original suit had the slightest interest in the property, which had been practically turned over to the Millers for more than twenty years. Every point in the cause of Chamberlain *v.* Isaacs had been decided, and as no appeal had been taken definitely, and conclusively decided, and no party to these proceedings except the Millers had in October, 1893, the slightest interest in the property. See Daniel Ch. B. P., pp. 1539–90. "No notice need be given of the application for an order, of course, as no opposition can be offered to it. If there is any irregularity in the order, or it has been obtained upon any false suggestion or by the suppression of any material fact, it will be discharged on special application by motion, although on the merits it would have been proper to make the order." Our Code contemplates such orders without notice. Secs. 402 (3), 403. I make these remarks on these proceedings only in order to decide all the points raised in the case, but I do not regard these *ex parte* proceedings at all essential to the validity of the Millers' title. I overrule the master's report.

From the decree in favor of plaintiffs, defendants appeal.

*Messrs. Lord & Burke*, for appellants, cite: *Parties and privies to partition decree:* 5 Rich. Eq., 531. *Revival of actions:* 42 S. C., 391; 22 S. C., 589; 35 S. C., 402; 22 S. C., 444. *Adverse possession:* 3 Strob. Eq., 138; 2 Hill Ch., 513. *Purchaser's title, kind:* Rich. Eq. Cases, 244.

*Mr. H. E. Young*, contra, cites: *Resulting trust:* 1 Strob. Eq., 110; 19 S. C., 134; 23 S. C., 256; 2 Bail., 101; 24 S. C., 592. *Dry trust:* 38 S. C., 34; 46 S. C., 526. *Declarations against interest:* 2 Hill, 489; 16 S. C., 142. *Revival of action:* 45 S. C., 323; 13 S. C., 241. *Order requiring executor to sell:* 11 Rich. Eq., 156; 2 Munif., 42; 2 Vern., 99; 2 S. C. (Ex. Eq.), 311; 2 Brock, 422; 14 S. C., 595. *May set up any title:* 1 Bay, 441 and 38; 2 Hill, 439; 1 Hill Ch., 376; 27 S. C., 53; 7 Wheat., 545; 70 Fed. Rep., 547. *Tacking:* 2 Rich., 22; 7 Rich., 355; 29 S. C., 372. *Presumption by possession:* 12 Ves., 267; Cow., 162; 12 Co., 280; 1 Hill Ch., 376; 1 Hill, 222; 3 Hill, 335; 14 S. C., 43; 17 S. C., 466; 20 S. C., 51; 23 S. C., 149; 14 S. C., 552; 2 Mill, 420; Cheves Eq., 57; 1 Strob., 25; 2 Strob., 6; 4 Rich., 50; 11 Rich. Eq., 269, 559; 28 S. C., 486; 31 S. C., 602; 36 S. C., 202; 37 S. C., 317; 38 S. C., 39; 46 S. C., 326, 356. *Adverse possession:* 45 S. C., 312; 24 S. E. R., 750; 13 S. E. R., 635; 26 S. C., 609; 44 N. E. R., 337; 5 S. C., 463. *Findings below:* 42 S. C., 182, 380; 44 S. C., 386; 47 S. C., 63. *Title by possession:* 17 Ohio St., 130; 53 N. Y., 287; 70 Fed. Rep., 552. *Purchaser's title, kind:* 6 Rich. Eq., 222; 9 S. C., 269; 24 S. C., 487. *Debts barred:* 15 Rich. L., 162. *Individual cannot bind firm after dissolution:* 20 S. C., 49; 23 S. C., 582; 25 S. C., 235; 33 S. C., 505; 26 S. C., 578.

Feb. 10, 1897. The opinion of the Court was delivered by

MR. CHIEF JUSTICE McIVER. These two cases, together with another brought by the same plaintiffs against Horatio C. Hughes (the last named case not being involved in this appeal), all growing out of the same state of facts substantially, and involving the same principles of law, were heard

and considered together by his Honor, Judge Benet, and from his decree the defendants in the two cases named in the title have appealed.

The facts are so fully and clearly stated in the Circuit decree, and the conclusions reached by the Circuit Judge are so satisfactorily vindicated by the reasoning which he has employed and the authorities which he has cited in his decree (which should be incorporated in the report of this case), that it would be a mere work of supererogation for this Court to add anything to what is there so well said. The Circuit decree is, therefore, adopted as the opinion of this Court.

The judgment of this Court is, that the judgment of the Circuit Court in the two cases named in the title be affirmed.